Thank you, Your Honor. May it please the Court. Number 2, here for Jackpot, Inc. Your Honors, this case is not one about stopping a restricted use of a word. Rather, this is about stopping the use of the term jackpot as a source-identifying brand name for an innovative online lottery ticket delivery service. And the District Court made multiple legal errors when it held that the use of jackpot does not encourage jackpotting, which is federally registered, for those very same services, effectively stripping the jackpotting bar of the protection that it deserves. I'd like to briefly discuss two of the Court's errors, similarity and confusion, and time-permitting weakness. As this Court made the theory, Sousa, because these errors involve a legal judgment as to whether certain Polaroid factors favor one party or another, the error would be denoted. So turning to the first error, that was confining jackpot and jackpocket are not similar. And the District Court did so by engaging in an over-emphasized, side-by-side comparison of the marks. That's fundamentally improper, particularly when those marks do not appear together side-by-side in the marketplace. Can you just explain to me – I'm trying to understand the concept of – I don't understand how I compare two things without putting them next to each other. Am I supposed to look at one and then just try to remember and then look back? And what if I've forgotten because I'm – how are you supposed to do that mechanically? Mechanically, you can look at the marks and, as an initial matter, judge whether there are similarities or differences. But then the analysis must be exactly what you're honored to say. So what's the difference? Then if I perfectly remember mark one and then I talk about it and how it's different from mark two, I guess I'm not sure mechanically what is the difference, unless you're presuming that I've forgotten some aspects of mark one in case wouldn't that be error? Well, it depends if the marks are side-by-side in the real marketplace, right? Because here we know from the record that the marks – you're saying just that the comparison needs to take into account how customers are going to encounter the marks in the marketplace. And so if they're not literally going to be side-by-side in the marketplace, just looking at them side-by-side doesn't necessarily tell you how the customers are going to react. It might be probative of that if they are extremely different. Maybe you know that even if the customers are going to encounter them in a slightly different way, there's no way they'd confuse them. But you're just saying you can't rely entirely on the side-by-side comparison if that's not how customers encounter them. Precisely right. Okay, so I understand that, but so why isn't that what the district court did? So the district court – I understand you're going to address the weakness maybe if you have time, but the district court thinks that the word jackpot is pretty common and so wants to sort of abstract from the – just the use of the word jackpot and then says, okay, is the way the logo is designed, is that going to lead to confusion or is the confusion just limited to the use of the word jackpot? And then talks about how users are going to encounter the logo when they visit the websites and so on. Why isn't that a legitimate comparison? Because there wasn't a so on. There wasn't a what? There wasn't a so on. You had mentioned, Your Honor, that the district court looked at how users will visit the website and so on. What was missing here was the so on. The court didn't look at the various ways that the mark appears in real life. And so for a concrete example, if you consider, and the record has evidence, that people see the jackpot mark when they're driving down the highway and they see a logo. That's quick and it's fleeting. Sometimes people will see it on the toppers of cabs driving by. Sometimes they'll see it in subways. They see it in a lot of different ways. That's not a careful, close inspection. And then when they see jackpot, and this is what was missing from the court's analysis, when they see jackpot, it's going to be separate at a different time. They're going to be left with only the recollection of what they remember about the jackpot mark. And that's the analysis that needs to be done. So I guess that's kind of where I was going to. Is that criticism of that mode of analysis essentially boiled down to that when you put things side by side or view them sequentially, when you put them side by side, it may be that minutiae are enough to distinguish the two marks, but that when they're not going to be seen side by side, minutiae are not enough to distinguish the marks. So in other words, I don't know how to put this in terms of flipping it around in terms of similarity, but is that the essence of your argument? They have to be even more distinct. Or no, they don't have to be as distinct. They can be confusing even though they're pretty similar? I'm trying to see how would you phrase that? So the way I would phrase it, Your Honor, is when you're not – in cases where products like here are not seen together side by side, and I think we've moved speed on that before we've worked on that, when people see the defendant's mark, they're left only with their recollection. So the differences in them will fall out of the wayside. And so the marks don't have to be as similar for there to be confusion. Another thing. So what about the websites then? Because presumably nobody – well, I suppose if you have two monitors, you might be looking at two websites at the same time. But most people pull up one website, and then later they look at another one. So by definition, it's sequential. I mean the websites don't look anything like each other, right? Well, the court rejected the notion that the websites should be seen side by side. Right. And so because they won't be side by side, people are only going to remember what they've seen. Right, but I'm saying they don't look anything like each other. So if somebody sees one and then they look at another one later, I mean it seems like we're not relying on minutia to say, well, there's a little green dot in the corner of one and not the other. And, of course, if you put them side by side, you'll notice the little green dot. I mean it seems that the overall impression of everything that's presented and the way the jackpocket is presented as opposed to jackpot, at least with respect to the websites, isn't – I don't see how that's going to carry over when a person is going to think – unless you're just talking about phonetically the word jackpot and jackpocket, right? Is that what it falls back to? Well, that is part – and that was part of the error, because jackpocket advertises on the radio. And there's record evidence that jackpot, they hadn't started in the marketplace by the trial. They planned to promote themselves by word of mouth. So when we're talking about radio advertisements, which is one of the ways that jackpocket is advertised, people hear jackpocket on the radio, then they see jackpot, they believe they're similar, they're going to confuse the two. Doesn't that just go back to the district court's determination that it's a weak mark because the term jackpot is one that's used frequently in connection with lotteries? Well, I think – well, that's the analysis. So if the confusion is about the term itself, then it does seem like the district court had already made the determination by the time the district court was comparing the logos. The district court said, well, it's a weak mark because the term jackpot is used frequently in this area. It's not unique and it has weak protection. So if you were to say that the comparison is erroneous because the district court didn't appreciate the confusion from the use of the word jackpot, aren't you just – you're going back to the other factor, right? Are you talking about the confusion factor? No, the strength of the mark factor. Right, and the strength of the mark factor where the court erred was in finding that – first of all, looking at the word jackpot, right? You have to look at the plaintiff's mark to determine the strength of the plaintiff's mark, and that's jackpot. And you have to look at the services that that identifies. And I think where the court erred, one of the errors, was not looking at the services. This isn't just buying lottery tickets. This is like Uber Eats. This is a service. It's a lottery courier service. It's unique. It's innovative. I had never heard of it. You go on an app. And typically, not a lot of people use the website. They use apps. So you have to, again, going back to this website analogy, you have to look at all the ways that the mark appears. People go on an app. They order a ticket for a lottery. The lottery courier service doesn't sell it. They go buy it for the customer, get it for the customer, and deliver it to them. So the word jackpot is – and on page 46 and 47 of our brief, we explain all the mental steps you need to take to go from jackpotting to lottery or courier services. And we distinguish that from the rice case and how that's different from the rice case because there's a lot of steps you have to take. Can I ask – are you following up on that? It's okay. I was curious about the presentation of the mark because I understand from the app I haven't seen it in action. But your app, when you open it, as I recall, it says jackpot, and then the word expands in some way to say jackpocket. Tell me why that doesn't cut in favor of the other side because you're trying to very consciously link jackpocket visually to what is otherwise a generic word, jackpot. And you're trying to convey this is basically – this basically is jackpot. Look, the words are the same. They just contract or expand. And then by doing that presentation, which I assume that you would argue we need to look at, right, how the mark is presented to the consumer, why does that not cut in the other direction? I'm sure you're going to tell me exactly why. Exactly. It actually helps because it shows that there's a strong – that the association between the do and the consumer, right? And one thing I love about it, you said that jackpot is generic. Jackpot may be generic for a jackpot, but it's not generic for the service you have at issue. Why is that the market? Why is the market generally lottery tickets, buying lottery tickets, getting it done through a service, et cetera, and of which the service is a relatively small part of that market? Because, you know, in this case it's just the lottery card services. It's just those two things. Those are the only services at issue. There's nothing to indicate from the marks that that's true. The marks themselves speak in terms of jackpot or jackpocket, and it's spoken quickly. It all comes out pretty much the same way. That's the market. So in that sense, why aren't we talking about a much broader market, which makes your client's mark that much weaker? Well, look at the cross-commerce picture on it. The court said, the Second Circuit said, when you look at a mark, it could mean a lot of different things, and that's indicative of its suggestiveness and its strength. When you don't know what the product is when you see the mark right away, and in that case it was the mark collected in cross-commerce. And so even if we look at the broader market here, when you look at the word jackpot, it could be a variety of different things. If your product was called lottery in your pocket because you're providing access to the lottery from your pocket, would that be a weak mark? That would be weaker than jackpot. It would be weaker than jackpot. And then if the competitor was just called lottery and didn't have the in your pocket, would you say that that's a strong infringement? If our mark was lottery in your pocket and then somebody had – Lottery. Or the lottery app, I guess. I think it could if there was actual infusion, but you'd have to look at it. You'd have to look at it. But it's a harder case. But why is that a harder case if jackpot is just a common term that's used to refer to a lottery because that's what you get if you win the lottery? Everybody who does the lottery is trying to get a jackpot, right? Because there's a number of mental steps, and actually that's a very good point, Mark, because one thing is if you order the ticket and get that courier service and get the ticket, they give it to you, and the hope is that you win the jackpot. That is the hope that you win the grand prize. But when you get that ticket, there's all sorts of prizes, and actually the record as it shows that – Because you might not get the jackpot. You might get some smaller prize than the jackpot. Well, there's a lot of promotion for free of the advertisement. Some records – People play the lottery. They want to win, right? And if they win, they scream jackpot, right? I mean isn't that just how lotteries work? Well, I think realistically a lot of people buy these tickets to win a prize, right? The jackpot – and that's why, again, this makes it kind of suggest – Is that because you have like some of these scratch-off cards where you get like two bucks or something? Well, these are – I don't know how these lottery tickets work on the app. Are there intermediate prizes available? Yes. Or are these all just – I don't know what they are. I don't know how these things work, mega millions or whatever. You either get the billion dollars or you get zero, or there are intermediate prizes you get. There are intermediate prizes. The record evidence shows – So that's like the deuce pot or something you get a little bit? I never heard that, Your Honor. But they do have – in the record, some examples are CA3, 5, 17, 19, 493. On those – and in the record, there's advertisements in JackPocket where they are advertising lower prizes and promoting people who have won. In one, there was somebody on a car who won $4,000. There's one – So if your finds were called prizes in your pocket, that would capture the gradations of prizes, and then it would be more accurate. But you're saying because it's focused on the biggest prize you could get, it's very abstract and unique to your service. It's another set that you have to take to get there because when you buy the thing, sure, it would be great to win the top prize. So you mentioned the rise case, right? I mean it's not that everybody will instantly think of rise whenever they think of a caffeinated beverage. It's like an abstract notion that like you're getting up in the morning or you have increased energy or something. But you might drink coffee for lots of different reasons. So why isn't that even more abstract than the relationship between a jackpot and a lottery? Well, because this is not – the analysis is not the relationship between jackpot and lottery, but a lottery courier service. That's a critical point. This is not a lottery. But there's a close connection between a lottery courier service and playing the lottery, right? Because a lottery courier service facilitates your ability to play the lottery. So terms that are really closely tied to the lottery would also be closely tied to a lottery courier service, wouldn't they? Yes, but – yes, Bob, right? Yes, but it's one step removed because you always have to look at the service, right? And again, this is like Uber Eats for lottery tickets. It's not the lottery. They're not selling lottery tickets. Well, that's a good example. So Uber Eats – I mean is Eats closely tied to a restaurant delivery service? I'd say it's suggestive, right? You have to think about it. There's a series of messages. So if somebody else says I'm going to call my thing Eats Express, would that be an infringement on Uber Eats? Well, again, you have to look at the confusion patterns. And if there is actual confusion and what they don't know, in this case, the actual confusion is actually very telling and very significant because people – and I know my time's up.  I want to be respectful. In the actual confusion, people said they were expressing confusion and not just mixing up words or making a title. They were actually acknowledging that these are two different companies, two different brands that they confuse. And in the record, we have a lot of examples. We put them in our brief. But things like – so let's say we thought the district court was right that it's a weak mark because the word jackpot is closely tied to the lotto and that's closely tied to a lottery delivery service. Would the evidence of customer confusion overcome that conclusion? Absolutely. How would it do that? Even if you were to find the mark or a finding that the mark is weak, it suggests that it is protectable. So it's not going to be registered as a contestant. But absolutely, because the confusion here was the type – first of all, any confusion is very significant. But before somebody enters the market, it's incredible. I mean this is the holy grail of this framework. This is – you rarely get confusion. And when you get it, you jump up and down. It's incredible to have it because it's so hard to find. But to have it before the defendants even enter the marketplace is remarkable. And that's the DeMeers case at the second circuit. But people were saying things like – and this is at CA-126. I thought jackpotting was jackpot.com. You had another person. This is CA-189 to 180. I didn't realize jackpot and jackpotting were two different sites. So these are anecdotes, which is generally weaker than a well-constructed survey, right? You would agree. But you're arguing that sort of – well, I guess you may not agree that it's weaker. I mean if you had a well-constructed survey created by 16 scientists and they validated this and had measurable confusion and everything, you would think that's the gold standard. But you're saying that because this anecdotal evidence arose beforehand, one would think there would be less chance of confusion because who should even know about jackpot? You're saying that that sort of – I don't know if you were saying that. That compensates for the lack of scientific rigor. Well, I will say, Your Honor, I mean Professor McCarthy, the leading commentator on trademark, said it's easy for any expert to rip apart another expert's survey. So I don't necessarily agree that surveys are the gold standard, right? Because they're often excluded. They're often criticized. No, no, no. But I mean one that's properly admitted and vetted and all that, I would think, would be the gold standard. I would say that actual consumer comments are probably stronger because they're so smart. They just come up. People say it because they're confused. The problem is that you don't know how many people are out there. It's like you have 100,000 people using the apps. 999,999 are not confused. But you get that one guy who's sending an email saying this is bizarre and confusing. That's pretty weak evidence of confusion, right? In context, but the reality is here we have a lot. I would say that you have just one instance. Why don't we do that? You said at most the district court should have concluded that the confusion was neutral, not that it favored jackpot.com. If it were, in fact, neutral, that wouldn't change the outcome of the balancing of the polarity factors, would it? Even if it were neutral? Well, because of the similarity factor. I think the similarity factor. All these factors interact. So you're saying taking away the conclusion that the confusion favored jackpot.com would leave the balance to jackpocket. If the similarity goes down. Because each of these factors affect each other, right? They touch on each other and impact each other. And one thing I'll note, one of the examples of confusion, A795 and 797 is an article. It's really, really telling because it's an article that came out after jackpot announced that it got funded. And the article said jackpot got funded, right? So the writer of this confused them, too. But what's really interesting about this is this isn't just a mere typo because this person had to go from jackpot to jackpot. So to do that, they had to know about jackpot. They had to take – they had the letters, right? This is not just a common word confusing people. Then in that article, they made all sorts of – and again, this is a 795 and a 797. They made all sorts of mistakes. They claimed that jackpot's CEO, their new CEO, was jackpocket. Then they said jackpot's investors specifically were jackpockets. Then they go and describe jackpocket's history and attributed it to jackpot. So it is a mishmash of confusion, and it shows the problem that these are just two places, the same service in the same industry. And jackpocket has to get some scope of protection that covers that. And the type of confusion we have is very varied. It's not just to consumers. So why don't we do this? You've reserved two minutes for rebuttal. We've kept you up considerably past your time. Why don't we hear from counsel for the appellate? Thank you. And we'll see you again. May it please the court, William Adams for jackpot.com. To take a step back, Your Honors, the district court found after trial and a meticulous opinion that seven of the eight Bolleroi factories either favored jackpot.com or were neutral. And plaintiff only challenged three. We've been talking about those this morning. Plaintiff thus does not contest the district court's findings that the products here require a high involvement decision. There is substantial consumer sophistication that makes confusion less likely. And the plaintiff also doesn't challenge that jackpot.com was acting in good faith. And on top of that, the district court found that it was plaintiff that acted in bad faith by adding a .com to its mark in an effort to move toward, by client, an increased customer confusion. Any potential confusion arises here because plaintiff chose to use a weak mark that incorporates key virtues of the products at a county table. I like this. Even if that's true, is it possible the other factors could overcome that? So if, in fact, it is common to use the word jackpot in relation to a lottery service, even a lottery courier service. If you have two very specialized services, lottery courier services, and they both have a play on the same word, isn't there just going to be a lot of customer confusion as there seems to be? It's not impossible for a weak mark, for the other factors to overcome a weak mark. But here, following trial, Judge Lyman found that no factors did overcome the weakness of the mark. The jackpocket is a suggestive term. There's no dispute as to that. But what's at dispute here is the descriptive term jackpot. And jackpot, if I could go back to Judge Giardini, Judge Giardini had said he preferred the opening screen of the app. And the opening screen of the app, if you download it on your phone now, it's still the same as it was at time of trial. We're not going to go outside the record on our phones. And you don't have to do that because if you look at A744 in the actual appendix, the physical appendix of the CD, and it's a final movie where it shows that the opening screen of the app starts out with jackpot and then expands to jackpocket. So in this circumstance, as Judge Lyman found, the plaintiff is trying to evoke jackpot, a common, ordinary term. And with it is coming to an extremely crowded field with substantial registrations of jackpot, substantial third-party use. Is the lottery career service an extremely crowded field? The lottery career service itself is not, Your Honor. So when you say extremely crowded field, you're just talking about lottery services in general. Lottery services in general, the broader lottery market of which lottery career services are a part, as Your Honor said, as Your Honor asked in question with my colleague, there's obviously a close connection between lottery career services and the lottery market broadly because that's one way in which you can buy a lottery ticket. And so I think it would be artificial to look only to lottery career services. And, in fact, the record is undisputed here. But these are the two lottery career services, right? I'm sorry? These are like the two lottery career services. They're at lotto.com. So there's another player in the market. But it's a small universe. So doesn't at least the proximity factor favor jackpocket? That's right. No, but the proximity factor. You were saying a moment ago that no factors favor jackpocket, but, like, at least the proximity does because they are coming into a very narrow market. I agree. We agree that one in the district court so found that one factor, the proximity factor, does favor the plaintiff here. But that's the only one because we have a weak part. Well, what about the confusion? So if we have this evidence of confusion, how could that favor the later mark? Wouldn't that show that people confuse the new challenger with the incumbent? No, you are right. It's just one and found. The anecdotal evidence here was extremely weak. It did not actually show any actual confusion as to source by any ordinary fruit consumer. That's the standard. Most of their evidence predates the announcement of the U.S. law. Well, if sophisticated observers who are reporting on the industry confuse the two companies, doesn't that suggest that it's confusing for the ordinary consumer? No, you are right. That's not the proper answer. We're going to refer this court. I'm going to refer you to the Starr Industries decision from this court, which makes clear that you need to be looking at prudent consumers because if you're well-versed in this space, if you may be of a different orientation, you may be thinking more about the incumbent. The incumbent comes naturally to your mind when you see something that might not be the case if you are an ordinarily prudent consumer, which is the standard. I think the consumers here are prudent in that they're investigating which service they're using for the lottery courier services. It's not that they just Google, like, how do I buy a lottery ticket on my phone, and they go to the first hit they get. The district court found, and this is in special appendix 125 to 126, that the consumers here do exercise a significant degree of carefulness and caution at the point of registration. And this is because they have to put in significant financial and personal information at that point. And that's a factual finding, and that's what we're viewed for clear error. That's a factual finding. So if there were a scenario where the consumers were not actually prudent and so on, then maybe it would be a closer question. That's correct, Your Honor. This is not that case, and I should go back. And as it's given, it's following a mixed trial. The district court's decision here is reviewed for clear error. To the extent there was a legal issue in certain decisions, that would be reviewed to no vote. The open balance is reviewed to no vote. But most everything my colleague has argued in brief and here today is a factual finding, which Judge Lyman should get substantial. What about the side-by-side comparison? Isn't it a mistake not to consider how people are going to see it for a fleeting moment on the top of a taxi or on a billboard? That could be an error. That is what the district court had done, but the district court did not do that. The district court – their side-by-side comparison argument turns on special appendix page 97, where the district court just put in the two marks for the reference of the reader. There's nothing – it ignores the context of the rest of the decision, which continues on, both before and after, where the district court expressly considers the full context of the mark, including the oral and says there are some similarities as to sound. That's on special appendix page 94. It says that's not dispositive in this context when you look at the websites as a whole, when you look at apps as a whole. When you look at the other contexts, including billboards, radio, media, that's on special appendix pages 12 to 16. The district court did a meticulous job looking at all the contexts, and to the extent that there's a complaint on the other side, it said you didn't go line by line, line by line, and spell everything out like the district court was, and there's no obligation to sort of have a multi-page analysis as to each particular – in each particular usage. And what's also a core, core point is that plaintiffs don't say that any of these usages that the district court apparently didn't consider make the similarity or make the commonality any more – any closer, make it a closer question than what he – than what they acknowledge that he did consider at pages 95 to 97 of the special appendix. So there's really no there there with respect to the side – with respect to the side-by-side – side-by-side issue. I would also – What about the investments that Jack Bockett has made in distinguishing their mark? I mean, does your court adequately consider that in deciding, you know, whether there's evidence of mark strength or a distinction? Sure. So they – that, Your Honor, is one of the six factors as to commercial or acquired strength that the plaintiffs don't challenge by other factors. And so with respect to ad spending, the district court was absolutely correct that the amount of the spin doesn't tell you anything by itself. The purpose of that analysis is to see if you are spending and therefore gaining brand recognition. And we know here, and the district court found as a matter of fact, that that ad spending did not result in brand recognition. That's a special appendix, page 91. Because he rejected their consumer studies, which found – or he found that their consumer studies showed only 19 percent unaided recognition. And our studies found 9.7 percent. So the idea is there that, if I'm understanding it, I guess you can pay these search engines that if you type in a word, you get to your page first. So if you dump a lot of money on that and people just click, because they always click on the first thing, that doesn't necessarily reflect brand recognition. Brand recognition is more of, oh, I remember that company. Let me go to Jones.com because Jones sells whatever the thing is. That's exactly right, Your Honor. And that's referred to as traffic steering. And it's not a legal ruling. I think they kind of make it seem like the district court said, well, that never could possibly be probative of commercial or acquired strength. But, in fact, here the district court found that, in practice, it didn't lead – it led people, maybe, to play this card, but it didn't create a brand association, a special appendix, page 91. That's not challenged. And so, therefore, there's no basis on which the commercial – these are commercial traits that possibly outweigh or overcome – help them overcome the weakness of the – the inherent weakness of their market. And I would like – one other final point, which is on the inherent strength of the market. I think it's very clear from this court's precedence that it's appropriate not only to consider the broader lottery market, but it's also appropriate to consider jackpot, the term jackpot, when considering the strength of the jackpocket market. I've referred the court to the Streetwise decision, the WW Farm decision versus DeWitt, where this court has repeatedly looked at components of a portmanteau in assessing the strength of the market. If there are no further questions – What about the argument that it's more – it takes more inferences to get from jackpot – sorry, excuse me – from jackpot to lottery courier service? There – I mean, this report found, as a matter of fact, that although it did require some imagination, and that's why the market's suggestive, that it was still a very close connection that it evokes jackpot. It evokes putting lottery – putting a jackpot in your pocket. In fact, plaintiffs admitted that's exactly what they're trying to evoke, and that's what we know from that – from the app on page 8744. It also reprinted it, especially from page 87, that's exactly what they're trying to evoke, putting jackpot in your pocket. This court actually works, but that doesn't require a whole host of leads. And that's what also distinguishes this – sorry, this is here from a commercial media, which my colleague referenced. In that case, the imagination was if the market was collective, it could have been a whole host of different enterprises, a whole host of different industries, in which it was suggestive of, but here jackpot clearly is associated with and evokes the lottery industry. Thank you very much. Counsel, for the appellant, you have reserved two minutes for rebuttal. We'll try to hold it to two minutes. Oh, thank you, Your Honor. Addressing my colleague's points, first on bank to bank, the record shows – there was some discussion in the brief about jackpotday.com, which was – the record shows, and this is at CA 5, 6, and 23, that jackpot had actually used the .com first, back in 2013, and the court had decided on the affirmative defenses, and this didn't affect much of the confusion analysis. Second, on the issue of source confusion, there very much was source confusion here. I gave just a few examples earlier, but there's one which is very telling, and that is from jackpot itself, the head of its customer service department characterized one consumer as, I quote, 100 percent confusing jackpot with jackpocket, and that's at A906 to 914. And on this issue of word of mouth, another person congratulated jackpot for jackpocket's radio waves. More confusion, very telling. Also, this issue of similarity. The court did not consider the effect on consumers of looking at jackpot on its own based upon what they remember from jackpocket separately. They didn't do that, and that's exactly what this court said in Louis Vuitton v. Burlington Coke Factory. Judge Calabresi reversed on the ground that, in that case, the marks were looked at side by side, not sequentially. On whether there are – the statement of review here, under the Susan case, all of these factors, all the things we're talking about are legal errors in analyzing confusion and similarity, so they are entitled to a de novo review. And as this court said, when a legal judgment is involved in this, which it often is, then that's the case. On Your Honor's comment about clicks to websites, one thing to remember is, in this case, the brand appeared on all of jackpocket's advertising. So when they went to that website, and this is the record at QSGA-12, the jackpocket name was there always. They saw it throughout the process. That builds brands, and that's why it was error to revert.